IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

VICTOR M. JAVITCH, Reciever,

                Plaintiff,                Case No. 3:02 CV 7072

-vs-

                                              MEMORANDUM   OPINION

PRUDENTIAL SECURITIES, INC.,
et al.,

                Defendant.

KATZ, J.

This matter is before the Court on cross-motions for summary judgment regarding arbitration. This Court has jurisdiction pursuant to 28 U.S.C. § 1331. For the reasons stated below, Defendants' motion for summary judgment compelling arbitration of the claims asserted by Plaintiff (Doc. 50) is well taken, and the same is granted.

**I. Factual Background**

This is one of many cases brought by the Receiver early in this viatical litigation against brokerage firms. See *Javitch v. First Union Securities, Inc.*, 315 F.3d 619, 621-622 (6th Cir. 2003). The Court will set forth a brief background of the pertinent facts.

James A. Capwill ("Capwill") was the principal of an accounting and escrow service known as Viatical Escrow Services ("VES"), as well as an accounting firm known as Capwill and Company ("C & C"). Capwill was also officer and agent of a wholly-owned entity known as Capital Fund Leasing LLC ("CFL"). Liberte Capital Group, LLC ("Liberte") engaged the services of VES and, pursuant to an escrow agreement, VES agreed to maintain escrow funds in an account for specified purposes. In April 1997, Capwill executed the escrow agreement on behalf of VES.

As a result of this agreement, VES accepted escrow funds on behalf of Liberte and Alpha Capital Group LLC ("Alpha").

In April 1999, Liberte commenced suit against Capwill, VES, and CFL for the wrongful transfer of escrow funds to the defendants' bank accounts or brokerage accounts in violation of defendants' duties to Liberte and their investors. *Liberte v. Capwill*, 5:99 CV 818 (E.D. Ohio) ("*Liberte*"). Alpha subsequently intervened in this suit and a receiver was placed in control of Capwill's entities. Multiple civil and criminal actions were spawned as a result of the *Liberte* case, including the case *sub judice*.

The Receiver initiated this suit against Prudential Securities, Inc. ("Prudential") and Wexford Clearing Services Corp. ("Wexford") for conduct related to the opening of brokerage accounts by Capwill and utilizing escrow funds entrusted to VES by Liberte and Alpha. Early in the litigation, Prudential moved to compel arbitration and to stay the proceedings. The Court stayed the proceedings in light of a related issue pending before the Sixth Circuit. Following a decision by the Sixth Circuit, the Court proceeded to rule on Wexford's motion to dismiss and motion to amend the complaint. Subsequently, the parties agreed to brief issues limited to validity of the arbitration agreements at issue. Those issues are now ripe for disposition.

**II. Discussion**

*A. The Sixth Circuit's Opinion*

In its opinion, the Sixth Circuit determined that the Receiver, Javitch, was the proper party to assert claims on behalf of the seized entities. *Javitch*, 315 F.3d at 627. Thus, the Sixth Circuit found that "Javitch, who is bringing claims on behalf of VES and CFL, is bound to the arbitration agreements to the same extent that the receivership entities would have been absent the

2

appointment of the receiver." *Id*. With regard to the arbitration agreements, the Sixth Circuit directed this Court as follows:

> If the [district] court determines on remand that Javitch's allegations challenge the validity of the arbitration agreements signed by Capwill on behalf of VES and CFL, that issue must be resolved before deciding the motions to compel arbitration. If valid agreements to arbitrate are found to exist, the court must determine whether the various disputes fall within the scope of the arbitration agreements.

*Id.* at 628. The Sixth Circuit also remanded on the issue of equitable estoppel for further clarifications, directing this Court to determine whether "Javitch, in asserting claims on behalf of VES and CFL, sought to benefit either directly or indirectly from the customer agreements that contained the arbitration clauses." *Id.* at 629.

## *B. The Agreements*

In August 1998, James Capwill opened several accounts with Prudential. Three of these accounts were opened in the name of VES,[1] and one was in the name of RJ Management.[2] Adam Bechler was the financial advisor who solicited Capwill's business and helped to open the accounts.

For each of these accounts, it is undisputed that Capwill signed a "Managed Assets Consulting Services Client Agreement," a "Cash Account Authorizing Resolution," and "Client's Opening Cash Agreement." Both the Managed Assets and Opening Cash Agreements contain arbitration provisions. The Authorizing Resolution is the document Capwill provided Prudential with the requisite authorization to invest funds.

---

[1] VES Account No. 969969-62; VES Account No. 950064-62; and VES Account 956060-62.

[2] RJ Management Account No. 969961-62.

3


The Managed Assets Consulting Services Client Agreement addresses arbitration as follows:

**8. GOVERNING LAW; ARBITRATION**

**(a) Arbitration is final and binding on the parties.**
**(b) The parties are waiving their right to seek remedies in court, including the right to jury trial.**
**(c) Pre-arbitration discovery is generally more limited than and different from court proceedings.**
**(d) The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appear or to seek modification of rulings by the arbitrators is strictly limited.**
**(e) The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.**

**This Agreement shall be governed by the laws of the State of New York, and shall inure to the benefit of [Prudential Securities Incorporated] PSI successors and assigns, and shall be binding on Client and/or Client's representatives, attorneys-in-fact, heirs, executors, administrators and assigns. In the event of Client's death, any order which Client had given PSI shall be binding on Client's estate representative until PSI receives actual notice thereof. Unless unenforceable under applicable law, any controversy arising out of or relating to Client's Program Assets, to transactions with Client, for Client or to this Agreement or the breach thereof, shall be settled by arbitrations pursuant to the Federal Arbitration Act in accordance with the rules, then in effect, of the NASD or the Board of Directors of the New York Stock Exchange, Inc. as Client may elect.**

The Opening Cash Agreement contains similar language regarding arbitration.[3]

---

[3]
**11. Arbitration is final and binding on the parties.**
- **The parties are waiving their right to seek remedies in court, including the right to jury trial.**
- **Pre-arbitration discovery is generally more limited than and different from court proceedings.**
- **The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited.**
- **The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.**

**The undersigned agrees, any by carrying an account for the undersigned you agree, all controversies which may arise between us concerning any transaction or the construction, performance or breach of this or any other agreement between us, whether entered into prior,**

(continued...)

In the summer of 1999, Capwill also opened several accounts with Agean Group. Wexford was the clearing broker for the transactions related to those accounts. The Agean account documents presented each contain similar arbitration language which designate the introducing broker to be a third-party beneficiary of the arbitration agreement as follows:

> **16. I agree that my broker is a third-party beneficiary of this Agreement and that the terms and conditions hereof, including the arbitration provision, shall be applicable to all maters between or among myself and either my broker and/or Wexford Clearing Services Corporation.**

It is from these agreements that both parties seek summary judgment on arbitrability.

### *C. Summary Judgment Standard*

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence

---

[3](...continued)
**on or subsequent to the date hereof, shall be determined by arbitration. This contract shall be governed by the laws of the State of New York, and shall inure to the benefit of your successors and assigns, and shall be binding on the undersigned, my heirs, executors, representatives, attorneys-in-fact, administrators and assigns. Any controversy arising out of or relating to my account, to transactions with or for me or to this Agreement or the breach thereof, and whether executed or to be executed within or outside of the United States, shall be settled by arbitration before either the New York Stock Exchange, Inc., or the National Association of Securities Dealers, Inc. Or any other self-regulatory organization of which Prudential Securities Incorporated is a member, as I may elect and under the then existing arbitration procedures of the forum I demand by you that I make such election, then you may make such election.**

supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250(1986) (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; see also *Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact."

*Williams*, 154 F. Supp. 2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; see also *Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

### D. *Validity of the Agreements*

"An arbitration agreement may be invalidated for the same reasons for which any contract may be invalidated, including forgery, unconscionability, and lack of consideration." *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 393 (6th Cir. 2008). "Ordinary state-law principles that govern the formation of contracts" are controlling in this analysis. *Id*. at 694 (internal quotation marks and formatting omitted). The party challenging the validity of an arbitration agreement bears the burden of establishing its invalidity. *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 89-91 (2000). Arbitration clauses are to be construed liberally, and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24 (1983). It is not sufficient to allege that the contracts were used to further a fraudulent scheme, absent a specific claim that the arbitration clause, standing by itself, was fraudulently induced. *Burden v. Check Into Cash of Kentucky, LLC*, 267 F.3d 483, 492 (6th Cir. 2001).

### 1. VES

Here, Plaintiff submits that VES lacked authority to invest the escrow funds with the Defendants. Based upon the limitations on VES's authority, Plaintiff asserts that Capwill was

7

unable to bind VES to the arbitration clauses here at issue via his own actual authority. The Court finds this position without merit.

"An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Restatement (Third) of Agency § 2.01 (2006). Such "actual authority" results from "the principal's consent manifested to the agent." *Wen Kroy Realty Co. v. Public Nat. Bank & Trust Co. Of New York*, 260 N.Y. 85, 91 (1932).

In this instance, the Plaintiff appends to his motion the escrow agreement between VES and Liberte, signed by Capwill on April 25, 1997. (Doc. 49, attachment 4, Exh. A). According to this agreement, "VES will act as escrow agent for all transactions structured as outlined in the following paragraphs." *Id*. With regard to the funds collected, the parties agreed, *inter alia*, that "[f]unds shall be invested or deposited in an interest-bearing account." This statement encompassed the extent of any restrictions upon VES regarding placement of the funds. The agreement was signed by Lynn A. Day, as VES's Operations Director, James A. Capwill, as VES's Managing Director, and Rick Jamieson as Liberte's Managing Director. The Court finds that this express delegation of authority regarding investments constitutes a grant of actual authority by Liberte to VES to enter into the arbitration agreements here at issue.

Plaintiff contends that VES's relation to Liberte was that of a special agent, as opposed to that of a general agent, and therefore that VES possessed only limited authority as an escrow agent to deposit funds it received and to disburse those funds. The distinction between a general agent and a special agent has been explained as follows:

8

> Courts have long distinguished between "general agents" and "special agents," a distinction that rests on both the objects of the discretion granted an agent and the mode of regulating the agent's exercise of discretion. *The labels matter less than the underlying circumstances that warrant their application.* . . . A principal may provide instructions to general as well as to special agents that further delimit their actual authority by restricting the discretion the agent would otherwise possess.

Restatement (Third) of Agency § 2.01 (d) (emphasis added.)

In this case, the distinction makes little difference. The escrow agreement here, by its very terms, has no limitations regarding investments. Therefore, whether deemed a special or general agency, the discretion granted to VES in this case was extremely broad, with no restrictions.[4] There can be no question that Capwill, as President of VES, was authorized by the escrow agreement with Liberte to open accounts (such as those he opened with Prudential) for the purpose of depositing or investing the escrow funds. The fact that Capwill, once the accounts were opened, misused his authority as escrow agent with regard to the funds deposited therein does not mean that the underlying account agreements were void *ab initio*. See *Javitch*, 315 F.3d at 628 (the contention that "Capwill exceeded his authority as escrow agent when he diverted funds to the brokerage accounts with the defendants" is not the same as "asserting that Capwill was without authority, actual or apparent, to sign the customer agreements on behalf of VES and CFL").

---

[4] By contrast, the cases relied upon by Plaintiff in support of his "special agency" argument involve specific limitations upon those special agents. *Sphere Drake Ins. Ltd.v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26 (2d Cir. 2001) (contract negotiation wherein the agent acted outside the scope of its agency with the knowledge of the third party); *Dayton Bread Co. v. Montana Flour Mills Co.*, 126 F.2d 257 (6th Cir. 1942) (agent exceeded authority and third-party purchaser had actual knowledge thereof); *Spengler v. Sonnenberg* 88 Ohio St. 192 (1913) (real estate agent exceeded his authority in entering into contract regarding the type of deed for the property at issue).

The evidence presented demonstrates that VES had authority to enter into an agreement with Prudential and had authority to agree to the arbitration clause. Therefore, the Court finds that a valid agreement to arbitrate exists with regard to VES.

**2. RJ Management**

As to the agreement on behalf of RJ Management, the Receiver contends the lack of a proper corporate form does not render the arbitration agreement valid as between Prudential and RJ Management. Prudential asserts Capwill had authority to open the account in the name of RJ Management.

Following a preliminary injunction hearing in the *Liberte* case, the interim Report and Recommendation (R & R)[5] of the Magistrate Judge noted R.J. Management was an entity owned by Rich and Laura Jamieson. The R & R also noted "R.J. Management is an abbreviated reference to EJT Management LLC dba R.J. Management LLC." *Liberte*, Doc. No. 568 at p. 3. The Court agrees with the description of Capwill's relationship with RJ Management described in the R & R:

> The R.J. Management fund intended to hold Liberte's commissions from sale[s] of viatical arrangements legally were the property of Mr. Jamieson and his wife. However[,] Mr. Jamieson gave Mr. Capwill power of attorney and Mr. Capwill used these funds as his own while reporting to Mr.Jamieson that he was engaged in successful investment programs. There had been an agreement between Mr. Capwill and Mr. Jamieson that Mr. Capwill would invest their funds to obtain returns greater than six percent and in exchange there was a profit sharing agreement with a 50/50 division of returns over six percent (Volume 8, page 809). *This arrangement gave Mr. Capwill full control over these funds.*

---

[5] The Court takes judicial notice of those pleadings contained in both the *Liberte* case and *United States of America v. Jamieson*, Case No. 3:00 CV 7312 (N.D. Ohio). *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 576 (6th Cir. 2008). *Jamieson* involved a forfeiture action by the government against both Jamieson and entities controlled by him, including RJ Management, LLC and EJT, Management LLC.

10

*Id*. at p. 5. (Emphasis added.) Thus, Capwill had actual authority to act on behalf of RJ Management.

It is undisputed the Receiver was not Receiver for RJ Management at the time he was appointed Receiver for VES and CFL. Under Fed. R. Civ. P. 66, "[a] receiver's authority is limited to those powers given by the court and a receiver may not deviate from those enumerated powers." 13 Moore's Federal Practice 3d § 66.04[1][b] (2009). Moreover, "[a] receiver only has those rights and powers to sue as the person or entity whose property is in receivership." *Id*. § 66.08[1][b]. In this instance, the Sixth Circuit has determined that the right of the Receiver to bring actions on behalf of VES or CFL does not extend to the investors. *Liberte Capital Group, LLC v. Capwill*, 248 Fed. Appx. 650, 655-662 (2005).

Seven months after the inception of the *Liberte* action, the Court extended the scope of the receivership"to cover any and all interests in any bank accounts or brokerage accounts which are or were in the name of James A. Capwill, Capwill & Co., CWN Group, or any other name into which *estate funds went*, with the exception of seven accounts [none of which pertain to RJ Management]." *Liberte*, Doc. No.272, at p.3. Capwill entered into the arbitration agreement between Prudential and RJ Management pursuant to the authority he had been given by Jamieson to make investments. The funds from RJ Management constituted Liberte sales commissions and were used to fund the Prudential investments. Those funds, in the Court's view, constitute estate funds, which fall within the scope of the Receivership estate per the Court's Order of November 9, 1999 in the *Liberte* case. Thus, the Receivership Estate is authorized to proceed in its suit against interests relating to the Prudential brokerage account, initiated in RJ Management's name. This renders the Receiver subject to the arbitration provision to the extent Capwill bound RJ Management in utilization of the estate funds.

11

To the extent that the documents in the record regarding RJ Management are the same forms utilized by Prudential in the opening of the VES accounts, and in the absence of any other argument challenging the validity of those provisions, the Court finds that the arbitration provisions contained therein are valid. (Doc. No. 53, Pltf's Ex. 7 and 8.)

**3. Wexford**

Plaintiff's claims against Wexford arise from a series of accounts Capwill opened with Agean, an introducing broker that clears its transactions through Wexford. As a clearing broker, Wexford performs only record-keeping and other ministerial functions, having no direct relationship with Capwill. The Agean account at issue here was opened in July 1999, in Capwill's name alone. The Agean account document entered into by Capwill contains an arbitration clause, expressly providing that Wexford is a third-party beneficiary of the arbitration agreement, and that the arbitration provision would apply to "all matters" between Capwill and Wexford. (Doc. 50, Exh. B, ¶ 16).

Plaintiff contends the arbitration agreement involving Wexford was executed after the appointment of the Receiver in the *Liberte* case, and therefore is void. But at that point, the receivership had only been granted over the VES and CFL entities, not accounts entered into by Capwill individually. The Receiver did not obtain the authority to pursue such accounts until November 1999, after Capwill executed the document with Agean here at issue. While the Court will consider more fully below whether Plaintiff may be bound to arbitrate pursuant to agreements entered into by Capwill in his individual capacity, the Court finds that the existence of a receivership estate over the VES and CFL entities (of which Wexford had no notice at the time of the account agreement's execution) does not invalidate the arbitration agreement pertaining to the claims against Wexford.

*E. Scope of the Agreements*

Next, the Court must determine whether the claims in this suit fall within the scope of the valid arbitration agreements the Court has found to exist. Upon review, the Court finds that the claims in this action all arise from contracts and relationships covered by the broad terms of arbitration clauses, and could not be maintained without reference thereto. See *Fazio*, 340 F.3d at 395-396 (finding that claims of "fraudulent activities," including "churning, unauthorized trading, and excessive risk-taking," "arose out of activities contemplated by [brokerage account] agreements."). The fact that some of Plaintiff's claims sound in tort does not change the analysis. See *id*. at 395 ("[M]erely casting a complaint in tort does not mean that the arbitration provision does not apply.").

*F. Equitable Estoppel*

Finally, the Court must determine whether Plaintiff may be bound to arbitration agreements executed by Capwill in his individual capacity under a theory of equitable estoppel. Nonsignatories may be bound to an arbitration agreement under ordinary contract and agency principles. *Arnold v. Arnold Corp.*, 920 F.2d 1269, 1281 (6th Cir.1990). A nonsignatory may be bound to an arbitration agreement under an estoppel theory when the nonsignatory seeks a direct (as opposed to an indirect) benefit from the contract while disavowing an arbitration provision. *Thomson-CSF v. Am. Arbitration Ass'n*, 64 F.3d 773, 778-779 (2d Cir. 1995).

In this case, a fair reading of the Complaint demonstrates that Plaintiff is seeking to directly benefit from account relationships created by Capwill in his individual capacity. The claims asserted by Plaintiff would not exist but for the existence of the investment accounts, which created the relationships between VES and Capwill on one hand and Prudential and Wexford on the other that are the subject of this suit. See *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen*, 206

13

F.3d 411, 418 (4th Cir.2000) (nonsignatory could not avoid contractual arbitration provision where the contract "provide[d] part of the factual foundation for every claim asserted" against defendant.). For example, Plaintiff brings claims for violation of securities regulations that only apply to securities customers who open accounts with licensed broker-dealers. Plaintiff cannot seek to assert rights arising from these contracts while avoiding the arbitration requirements contained therein.

Plaintiff's claims against Wexford are also subject to equitable estoppel. Wexford had no direct contact with Capwill, and its role was limited to carrying out its contractual obligations as a clearing broker. Thus, any claim against Wexford must arise exclusively from its obligations to Agean and Capwill under contracts that contain valid arbitration clauses. Plaintiff cannot simultaneously assert claims against Wexford while avoiding the arbitration provisions.

## III. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment to compel arbitration (Doc. 50) is granted, and Plaintiff's cross-motion (Doc. 49) is denied. This case is stayed until completion of the arbitration.

IT IS SO ORDERED.

    s/ *David A. Katz*
DAVID A. KATZ
U. S. DISTRICT JUDGE